Filed 8/16/22  In re Dominic F. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Dominic F. et al., Persons Coming Under the Juvenile Court Law. | B314083 |
| _____ | (Los Angeles County Super. Ct. No. 19LJJP00406A–C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| M.B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellant M.B. (Mother) challenges the court's juvenile custody order, arguing the juvenile court abused its discretion when it ordered monitored visitation for Mother.

We disagree. We find the juvenile court did not abuse its discretion in ordering monitored visitation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This is Mother's second appeal in this matter. The sole issue raised by her in the first appeal was whether the juvenile court complied with the formal notice requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law (Welf. & Inst. Code,[1] § 224 et seq.). We affirmed the juvenile court's finding that ICWA did not apply. (See *In re D.F.* (2020) 55 Cal.App.5th 558.)

A.    *Referrals, Investigation, Removal*

On March 8, 2019, the Los Angeles Department of Children and Family Services (DCFS) received a referral alleging Dominic F. (born in 2003), G.F. (born in 2006), and B.F. (born in 2011) witnessed domestic violence between Mother and Father in the home.

A children's social worker (CSW) met with Mother, who was at the Antelope Valley Courthouse trying to get a restraining order against Father. Mother reported Father uses marijuana and drives the children around while he is under the influence. She also described multiple instances of mental and physical abuse by Father. She showed the CSW a video recording of her

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

home's interior, with items thrown around and broken by Father. Mother reported she was placed on a 5150 hold a few weeks ago; per Mother, she "was sad but did not want to kill [any]one." She was given three prescriptions of psychotropic medications. She said her friend placed her on a 5150 hold because she is "against the mother." She said her son Dominic also "turned against her." Mother told the CSW she feels "everyone is against her and has sided with the father." Mother sent numerous text messages to the CSW, suggesting that the CSW and DCFS were "plotting against" her to make her "look bad."

Fifteen-year-old Dominic reported that Mother broke down two weeks ago and made threats which he and Father heard. He reported Mother was angry at Father "but redirected her anger" towards Dominic. He heard Mother say she was going "to kill" someone; he never heard her say things like that before.

Twelve-year-old G.F. reported his parents "fight over 'stupid stuff most of the time every day.' " He reported that "dad does drugs because his mother says it all the time." G.F. feels "scared" when they yell and has seen Father push Mother. Seven-year-old B.F. also reported having seen Father push Mother to the ground. She said that her parents "fight a lot." B.F.'s teacher informed the CSW she is concerned for B.F.'s safety in the parents' home because B.F. told the teacher that Mother fell down while Mother and Father were fighting. B.F.'s teacher reported Mother harassed her with emails that were "nonsensical and bizarre," including messages of abuse by Father and a video where Mother said she had a black eye and Father had "defecated in the toilet on the mother's toothbrushes."

The CSW reviewed Los Angeles County Sheriff's incident report from December 2018, indicating Mother suffered domestic

3

violence from Father. Mother had a bruise under her eye and a black eye during an incident where all three children were present. Mother denied Father caused the physical abuse.

An incident report from February 2019 noted Dominic said Mother was mentally ill and made suicidal statements. He was upset and informed law enforcement Mother said she was "going to shoot him." Mother had bought a gun and ammunition two weeks prior to this incident. Mother admitted to the deputy she had made suicidal statements. She was taken to Kaiser and placed on a 5150 hold for being a danger to herself and others. Mother's gun and ammunition were taken by law enforcement.

On April 8, 2019, DCFS received another referral alleging domestic violence where Mother and Father "got into a verbal agreement in the hallway," resulting in Father pushing Mother in the children's presence. Mother had an "abrasion to her chin and a bruise to her right forearm." Per the reporting party, Mother and Father have a long history of domestic violence. From April 8 to 16, 2019, DCFS "made several attempts to assess and interview" the children but Mother removed the children from school and had not allowed them to attend school since March 19, 2019. Mother denied the CSW access to the children.

On May 26, 2019, a new referral was generated by allegations of general neglect by Mother and emotional abuse by Father as to all three children. The referral alleged there was domestic violence between Mother and Father in the presence of the children. Father put a plastic clothes bin over Mother and forced her to the ground, causing her to sustain scratches and bruising. Law enforcement was called. Mother refused a protective order and did not wish to prosecute because "if father went to jail, she and the children will not be able to eat."

4

On June 4, 2019, the CSW spoke with G.F.'s teacher, who reported G.F. appeared "happier and more structured" at the beginning of the year when he was with Father. The teacher had not received any schoolwork from G.F. since Mother pulled him out of school. Other students informed the teacher G.F. complained he was not getting enough food from Mother, Mother uses drugs, and Father beat up Mother.

On June 6, 2019, the CSW spoke with Father, who denied any physical altercations with Mother. He stated he wants to "give his children a better life." Father denied current substance abuse but also denied participating in an on-demand drug test. Father did not disclose the last time he used marijuana.

Later that same day, the CSW received multiple text messages from Mother, bizarrely saying Mother knew the CSW from a party in Altadena 14 years ago, the CSW is on Father's side, the CSW "has had sexual relations" with Father, and Mother will continue "to pursue and sue" the CSW.

On June 7, 2019, the juvenile court authorized DCFS to remove the children from the custody of their parents.

B.    *Petition and Detention*

On June 17, 2019, DCFS filed a petition on behalf of Dominic F., G.F., and B.F., pursuant to section 300, subdivisions (a) and (b)(1). The petition alleged Mother has mental and emotional problem including "paranoia, anxiety, and erratic behavior with homicidal and suicidal ideation," rendering her incapable of providing the children with regular care and supervision. Mother was involuntarily hospitalized for treatment and evaluation of her psychiatric condition from February 23 through 28, 2019.

5

The petition further alleged Mother and Father have a history or engaging in violent physical and verbal altercations in the presence of the children, including: 1) the March 31, 2019 incident where Father pushed Mother, causing her to fall against a wall in the children's presence and to sustain bruises to her right wrist and right eye, a laceration around her right ear, and an abrasion to her chin; and 2) the May 26, 2019 incident where Father placed a plastic clothes' basket on Mother's head and forced her to the ground in the children's presence, causing her to sustain an abrasion to her chest and right shoulder and redness on her back. Mother failed to protect the children by allowing Father unlimited access to the children. Father's violent conduct and Mother's failure to protect the children endangered the children's physical health and safety and placed them at risk of suffering serious physical harm and damage.

The petition also alleged Father has a history of substance abuse and is a current user of marijuana, rendering him incapable of providing the children with regular care. On prior occasions, Father placed the children in an endangering and detrimental situation by driving a vehicle with the children as passengers while he was under the influence of marijuana. Mother knew of Father's substance abuse and failed to protect by allowing him unlimited access to the children.

At the detention hearing on June 19, 2019, the juvenile court found there was a prima facie case that the children were described by section 300 and ordered them removed from both parents' care and placed with DCFS. The court granted the parents monitored visitation, three hours per visit, three times a week, in a DCFS-approved setting. DCFS was ordered to provide family reunification services.

6

C.    *Continued DCFS Investigations*

On July 2, 2019, B.F. stated Mother and Father scream and curse a lot, as well as "fighting, like kicking and punching each other." B.F. stated: "I saw my daddy push my mom." Regarding her 5150 hold, Mother stated she "was hospitalized wrongfully" because Father used a cop he knew. Mother stated Father smokes marijuana "regularly."

Despite the juvenile court's June 19, 2019 order granting Mother monitored visitation, as of July 8, 2019, Mother had not had an "official" visit with the children, and only spent time with the children after a medical appointment at Kaiser. The children's caregiver (maternal aunt) scheduled a visit on a date chosen by Mother, but Mother did not appear.

On July 9, 2019, Father filed a request for a restraining order against Mother, stating Mother hit him in the face with a set of keys, threw most of his clothes into the trashcan outside their home, and sent him "over 200 abusive, threatening, and harassing text messages." On July 11, 2019, Mother requested a restraining order against Father, and stated Father pushed her and sent her "degrading, humiliating" text messages. The juvenile court granted both parties' requests for restraining orders.

On September 5, 2019, Mother requested another restraining order against Father. Father was arrested on an outstanding warrant due to domestic violence. A criminal protective order was issued protecting Mother. On September 6, 2019, Father requested another restraining order against Mother, stating that Mother continues to make threats against him and is trying to cause him to violate the protective order. She also broke his $600 guitar. On September 6, 2019, the

juvenile court denied both parents' requests for a TRO. The court noted that the criminal protective order remained in full force and effect.

On September 20, 2019, the maternal aunt notified DCFS that neither she nor maternal grandparents will monitor any more visits with Mother due to her "criminal threats" and "erratic behavior."

D.    *Jurisdiction and Disposition*

At the October 16, 2019 jurisdictional and disposition hearing, the court sustained two allegations in the petition pursuant to section 300, subdivision (b)(1): the parents had a history of domestic violence where Father was violent against Mother, and Mother failed to protect the children; and Mother had mental and emotional problems which rendered her incapable of providing the children with regular care and supervision and Father failed to protect the children. The court dismissed the remaining allegations. The court issued a three-year restraining order protecting Father against Mother; it denied Mother's request based upon the existing protective order.

The minors were declared dependent children of the court under section 300, subdivision (b); were removed from the care and custody of their parents; and were ordered to be placed under DCFS supervision. Mother and Father were granted reunification services and monitored visitation with DCFS discretion to liberalize. Mother was ordered not to have contact with maternal aunt.

Mother's court-ordered case plan required her to submit to drug/alcohol testing upon suspicion of use and enroll in a DCFS-approved domestic violence program, a parenting program, and individual counseling to address case issues.

8

E.    *Post-Adjudication Updates to the Court*

B.F. refused visits with Mother on November 4 and 9, 2019. The CSW visited maternal aunt's home to check on the children, and noticed B.F. was screaming and running back and forth around her room.  The CSW asked maternal aunt how long B.F. had been acting this way, and maternal aunt stated, "Since she returned from her visit with her mother on Thursday" (2 days prior to CSW visiting the youth).  Maternal aunt reported she has blocked Mother from calling her cell phone because of the juvenile court's no contact order, but Mother still sends her "long text messages using profanity and making threats."  She showed Mother's texts to the CSW, including a message where Mother stated the CSW and maternal aunt "were 'Fu*ked.' "  Dominic told the CSW Mother "argues with him for hours on [his] cell phone."

On November 18, 2019, DCFS filed an ex parte request to change court orders.  The juvenile court modified Mother's visitation; it was now to be monitored at the DCFS office three times a week for three hours per visit, with DCFS discretion to liberalize.  Mother was ordered not to contact the minors via text message but was allowed monitored phone calls.  The court ordered conjoint counseling for Mother and the children.

In a last minute information report, DCFS informed the court Mother was "not cooperative" during meetings and used "foul language."  She was not compliant with her visitation schedule and cancelled her visits on December 20 and 27, 2019. B.F. and G.F. did not want to visit Mother on December 13, 2019. Mother was 45 minutes late for her visit on January 3, 2020. Maternal aunt told the CSW Mother continues to harass her via phone calls and text messages and uses "foul and inappropriate

9

language." Maternal aunt also stated Mother discusses the case "in a negative way" with the children and badmouths maternal aunt to the children. Maternal aunt notified DCFS that Mother still continues to text the children in violation of the court's November 18, 2019 order.

Meanwhile, Father moved to a new home and began preparing the home "for when he gets overnights with the children in the future." He stated he "is going to do everything possible to get them back." The CSW assessed the home and found no safety concerns. The CSW "recognized the father for his effort and his accomplishments." Father's unmonitored visitation was set to begin on December 15, 2019. DCFS found Father was in full compliance with the court's orders and participated in therapy and court-ordered programs.

During Mother's phone call on January 13, 2020, Mother called the CSW a liar and a bitch, and yelled and screamed at her, resulting in the CSW terminating the phone call. Mother sent the CSW an email that same day, telling her, among other things: "[Y]ou don't deserve any respect, you're not a respectable person. You're lying and cheating and abusing my children . . . and you are going to pay consequences." Meanwhile, Father's child and family team (CFT) meeting went well, and DCFS approved weekly overnight visits for Father with the children.

On January 15, 2020, the juvenile court ordered an Evidence Code section 730 evaluation of Mother and restricted her visits to once a week for three hours per visit at the DCFS office.

Via a supplemental report, DCFS informed the court B.F. stated she "does not miss her mom much and that she gets along better with her dad." G.F. stated he is happy and "likes being with his father and looks forward to sleeping at his house." Dominic F. reported Mother "wants me to change my mind about my dad and she keeps telling me that he was the one that's hurting me. But I keep telling her that she's the one." Maternal aunt informed the CSW she heard Mother say negative things to Dominic, such as "eff you you're not my kid." DCFS also informed the court Father "appears to be fully committed and compliant with court ordered case plan on track to reunify with his children." Father has unmonitored overnight visits with the children "regularly." On February 18, 2020, the juvenile court authorized DCFS to release the three minors to Father.

On March 16, 2020, the children were released to Father.

F.    *Review Hearings*

On March 27, 2020, DCFS informed the court Mother "has not participated in any court ordered services" and continues "to not take any responsibility for her actions." Significantly, Mother cancelled all visits with the children "for the last month due to being mad at [DCFS]." She was a "No Show" for all drug/alcohol tests.

On April 2, 2020, the juvenile court continued the six-month review hearing because of COVID-19.

On July 8, 2020, DCFS informed the court that the children were adjusting well at Father's home; B.F. has not had any tantrums since living with Father. Mother, however, had not made herself available to the CSW and had not participated in any services. Mother continued to have telephonic conversations with the children.

11

At the September 23, 2020 six-month review hearing, the juvenile court granted Mother visitation at any DCFS-approved location, ordered DCFS to assess Mother's home for visits, and granted DCFS discretion to allow the children to visit at Mother's home. The court found substantial progress by Father and returned the children to Father's custody.

On October 19, 2020, DCFS informed the court Mother continued to violate the juvenile court orders by contacting G.F. and Dominic via social media. Mother reported she is taking a domestic violence victim class and participating in a parenting course. Mother did not know whether the courses were DCFS-approved. When the CSW contacted the program supervisor, she discovered the courses "aren't formally assessed" and they "don't monitor individual learners" so there was no way of knowing Mother's actual participation in the program. Mother told the CSW she has not had any in-person visits with the children since January 3, 2020.

On October 16, 2020, the CSW conducted a home assessment and found Mother's home was furnished, but unkempt. The dining room table consisted of broken glass and dishes with old food. The kitchen had "a trail of dirty dishes along the counter" and an empty half pint bottle of Jameson whiskey. There was drug paraphernalia under the kitchen sink, which Mother said belonged to Father. The bedroom floor also had broken glass. Mother informed the CSW she stopped participating in programs when she discovered the classes she took were not DCFS-approved.

At the October 23, 2020 review hearing, the juvenile court authorized DCFS to allow monitored visits in Mother's home so long as there was no debris, glass, or alcohol in the presence of the children. DCFS was to assess all appropriate relatives as monitors for Mother.

On February 5, 2021, DCFS informed the court the children were doing well in Father's home. Mother's paranoia and erratic behavior, however, continued to rear its head during communications with the CSW and during the CSW's attempt to conduct another home assessment. For instance, on January 11, 2021, Mother arrived an hour late with a newly shaved head. She stated what was happening to her "wasn't constitutional and that it was a setup." She believed Father knew the CSW and the juvenile court judge. Mother also told the CSW that Father "had injected her body with poison and bugs." Mother also sent a text message to the CSW, claiming the CSW "broke into her home in the middle of the night and broke her tooth."

On February 24, 2021, Mother filed with the court a certificate of completion, dated October 17, 2020, for the "UpToParents" program on divorcing parents. However, this course was not approved by DCFS or the juvenile court.

At the February 24, 2021 review hearing, the juvenile court found Mother had not made substantial progress in her case plan and terminated her reunification services. The court ordered DCFS to arrange a minimum of one monitored visit with Mother, and to provide the court with a report on Mother's visits. Mother was ordered to cooperate with DCFS and the CSW. Mother was ordered not to have any contact with the minors via social media or phone.

On March 8, 2021, DCFS informed the juvenile court it arranged monitored visitation for Mother and the children on February 27, 2021. The visit went "very well." Mother was appropriate in demeanor and "engaged each youth in age-appropriate discussion and activities." Mother did not discuss the case or speak negative of Father during the visit. Maternal grandfather was the mutually agreed-upon visitation monitor for Mother. Mother had monitored visitation on March 3, 6, and 8, 2021, all of which went well with no concerns. Mother also provided a certificate of completion for a one-hour domestic violence victim empowerment course dated March 9, 2021, which, again, was not DCFS-approved.

At the March 9, 2021 review hearing, the juvenile court found the conditions which justified the assumption of jurisdiction no longer existed and terminated jurisdiction. It stayed the order terminating jurisdiction pending receipt of a juvenile custody order. The court found "Mother has not completed her case plan, and the programs that she's enrolled in at her discretion is not sufficient. Nor has she learned from those programs, based upon her behavior over the last several months." The court awarded joint legal custody to Mother and Father and sole physical custody to Father. As to G.F. and B.F., Mother was granted monitored visitation once a week for four to six hours at a neutral location, with either maternal grandparents or a mutually agreed-upon professional to monitor the visitation. As to Dominic, Mother was granted unmonitored visits so long as Dominic consented. Mother was ordered to complete DCFS-approved courses and individual counseling with a therapist. Mother was further ordered not to contact the minors through their cell phones.

On March 11, 2021, the juvenile court received and filed the juvenile custody order, lifted the stay, and terminated jurisdiction.

On March 11, 2021, Mother filed an application for rehearing. On May 7, 2021, the juvenile court granted Mother's application for rehearing "by operation of law" for failing to consider it within 20 calendar days as required.

At the rehearing held May 21, 2021, the juvenile court found progress by Mother was not substantial, and that returning the children to Mother was not appropriate at this time. The court terminated jurisdiction in accordance with the juvenile custody order filed March 11, 2021.

Mother timely filed a notice of appeal. Father did not appeal.

## DISCUSSION

Mother challenges the juvenile court's order requiring monitored visitation with her children. As Dominic F. is no longer a minor, this appeal does not pertain to him. It applies to his two minor siblings only.

A.    *Standard of Review*

We review a juvenile court's decision to terminate jurisdiction and to issue an accompanying exit custody order for abuse of discretion. We may not disturb such a ruling unless the court made an arbitrary, capricious or patently absurd determination. (*In re C.W.* (2019) 33 Cal.App.5th 835, 863.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

15

B.      *Applicable Law*

When a juvenile court terminates jurisdiction over a dependent child, it may issue family law orders governing custody or visitation, commonly referred to as exit orders. (§ 362.4, subd. (a); *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.)  " 'When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation [exit] orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.' "  (*In re Chantal S.* (1996) 13 Cal.4th 196, 203 (*Chantal S.*); see *In re John W.* (1996) 41 Cal.App.4th 961, 970, fn. 13 (*John W.*).)

The juvenile court has broad discretion in making custody orders when it terminates jurisdiction in a dependency case. (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.)  The court must "make an informed decision concerning the best interests of the child" (*John W., supra*, 41 Cal.App.4th at p. 972.), and its primary concern must be a determination of " 'what would best serve and protect the child's interest.' "  (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652; see also *In re Nicholas H.*, at p. 268; *Chantal S., supra*, 13 Cal.4th at p. 206.)  "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child."  (*Chantal S.*, at p. 201.)

C.      *The Juvenile Court Did Not Abuse its Discretion in Ordering Monitored Visitation for Mother.*

Mother contends the juvenile court abused its discretion when it ordered monitored visitation for her as part of the juvenile custody order.  She believes unmonitored visitation is in

16

her children's best interests. She believes the last few months in this case demonstrated Mother was "appropriate, loving and properly engaged with the children," such that the children would not be at risk of danger or harm if Mother visited them without a monitor present. She asks us to reverse the order for monitored visitation.

We disagree with Mother.

Based on a review of the record, we cannot say the juvenile court acted arbitrarily in ordering Mother to have monitored visits with her children.

Mother focuses on the recent few monitored visits with her children that went well—namely, the visits on February 27, March 3, 6, and 8, 2021. However, she fails to mention the preceding two years where Mother made threats to her children, discussed inappropriate topics with her children, failed to maintain consistent visits with her children, and did not enroll or participate in DCFS-approved programs or complete the court-ordered case plan. Mother's lack of effort and progress from 2019 to 2021, notwithstanding the four recent visits in February and March 2021, supports the court's order of monitored visitation.

This is a case where Mother had a mental health history of paranoia, erratic behavior, and a four-day 5150 hold following threats to kill her son Dominic. The record is replete with instances where Mother made extremely inappropriate and bizarre statements, including telling the CSW DCFS was "plotting against" her to make her "look bad"; harassing B.F.'s teacher via "nonsensical and bizarre" emails including a video where Mother said Father "defecated in the toilet on mother's toothbrushes"; telling the CSW she knew her from a party in Altadena 14 years ago, and the CSW "had sexual relations" with

17

Father. She repeatedly alleged conspiracy theories about Father being in cahoots with the CSW and the juvenile court judge. She also stated she "was hospitalized wrongfully" because Father used a cop he knew. She refused to accept responsibility for her actions and refused or failed to participate in DCFS-approved or court-ordered services or programs. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; see also *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 [a parent's denial of a problem may be probative to determining whether the parent is likely to modify the behavior in the future].)

The record is replete with evidence of Mother's failure to adequately address her mental health issues. The juvenile court ordered her to submit to an Evidence Code section 730 evaluation in January 2020, but the record does not confirm Mother's compliance. There is also no proof of Mother's participation in individual counseling to demonstrate that she is working on her mental health and capacity to care for the children. Plus, it was relatively recently (January 2021) when Mother told the CSW Father "had injected her body with poison and bugs" and then sent a text message to the CSW, claiming the CSW "broke into her home in the middle of the night and broke her tooth." That is one month before Mother's positively-reviewed visit in February 2021 and two months before her positively-reviewed visits in March 2021.

While Mother submitted a certificate of having participated in a one-hour domestic violence victim empowerment course in March 2021, the course was neither DCFS nor court-approved. Completion of a one-hour-long unapproved program, more than two years after DCFS involvement, is hardly compliance. There

18

was no indication Mother has made any significant progress in the court-ordered case plan, which we find is a crucial component in determining whether to reunify a parent with their children or, at the very least, in determining whether the parent has shown enough progress to warrant unmonitored, as opposed to monitored, visitation. It is also quite relevant there is a huge gap in Mother's visitation with the children, as she opted to forego visitation completely from January through October 2020 and cancelled all visits with the children for a month because she was "mad" at DCFS.

The record shows Mother's behavior, up until recently, upset the children. B.F. actually had tantrums and behaved differently after visits with Mother. Mother did not obey the no-contact orders and continued to discuss the case with the children and badmouth Father or caregiver maternal aunt to the children. We applaud Mother's recent progress. But it makes sense to order monitored visitation to ensure Mother maintains appropriate, non-upsetting visitation with her children. Based on the record before us, monitored visitation is in the children's best interest.

Based on the foregoing, the juvenile court's order for continued monitored visitation was reasonable and appropriate.

## DISPOSITION

The juvenile custody order for monitored visitation is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur,


GRIMES, J.


WILEY, J.